IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2008

STATE OF TENNESSEE v. DARRELL FRANKLIN

Appeal from the Criminal Court for Shelby County
No. 07-01517     James C. Beasley, Jr., Judge

No. W2007-02772-CCA-R3-CD  - Filed January 5, 2009

The Defendant, Darrell Franklin, was convicted of one count of robbery, a Class C felony, and sentenced as a Range III, persistent offender to twelve years in the Department of Correction. In this direct appeal, he argues that (1) the trial court erred in admitting certain testimony over his hearsay objection and in violation of his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution; (2) the State presented evidence insufficient to support the Defendant's conviction; (3) he received an excessive sentence; and (4) the cumulative effect of the trial court's errors deprived him of his constitutional rights to due process and trial by jury. We conclude that the State presented evidence sufficient to support the Defendant's conviction and that the trial court did not err in sentencing him. We also conclude, however, that the trial committed plain error by admitting certain testimony in violation of the Defendant's right to confront the witnesses against him. We accordingly vacate his conviction and remand this case for a new trial.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;
Remanded

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Robert Jones, Shelby County Public Defender; Phyllis Aluko, Assistant Public Defender, Memphis, Tennessee, for the appellant, Darrell Franklin.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; William L. Gibbons, District Attorney General; and Pamela Fleming, Assistant District Attorney General, for the appellee, State of Tennessee.

OPINION

**Factual Background**

The actions giving rise to this case began on July 29, 2006. On that day, a Saturday, Melissa Polson was working as a cashier at a Yorkshire Cleaners in a Memphis "strip mall." She testified that at about 10:00 a.m., she was behind her cash register serving a customer and facing the store's entrance. A second customer had been waiting for three to four minutes. As the first customer left the store, the second customer walked up to the counter. Polson, who at this point had her head down but who had observed the second customer during the previous waiting period, asked him his name. Polson thought his answer sounded like "Phillips," but she was unsure. She looked up at his face and asked him again. At that point, he ordered "[G]ive me all of your money or I'll blow your ass off."

Polson looked back down, away from the man's face. She believed from his threat that the man had a weapon, although she did not see one. She immediately tried to open the cash register. As it sometimes had in the past, the key jammed on her first attempt to turn it. After another few moments, she successfully opened the cash register and began slowly placing the money therein on the counter. When she was finished, the man told her to lift the cash register tray and remove any larger denominations. She did so, revealing no additional bills. The man then told Polson to back up, turn around so as to face away from the store entrance, and count to ten. She did so and began to count slowly. When she reached nine, she heard the store's bell chime, indicating that the door had been opened. When she reached ten, she turned around, looked up into a security monitor showing the sidewalk in front of the store, and saw in it the man moving from right to left as she faced the front of the store. She then directed her eyes out the window and saw a shadow "speed-walking" away in the same direction. Polson testified she was certain less than fifteen minutes elapsed between the time the perpetrator entered the store and the completion of the robbery. She could not give a more precise estimate, but she acknowledged that time seemed to slow down and that the robbery may have taken only a few minutes.

Polson then went outside. Looking to her left as she exited the cleaners, she saw a contractor helping to remodel the restaurant next door. She also saw the full profile of a white minivan in a parking lot space about twenty feet in front of her. Polson noted on cross-examination that the strip mall ended about twenty feet to her left; she did not believe the man who robbed her, traveling at the speed she observed, could have reached the corner by the time she stepped outside. She admitted, however, that he could have reached the corner had he taken off running immediately after she observed his shadow through the store window.

Polson saw the white van begin to back out of its parking space. She could not see the driver of the white van but, noticing no one else in the parking lot, believed it to be the man who robbed her. Because she felt unable to do so herself due to the stress of being robbed, she approached the contractor, told him she had been robbed, and asked if he would get the minivan's tag number. Polson testified that he did so, approaching to within two or three feet of the minivan as it pulled away. The contractor then went into Yorkshire Cleaners with Polson, where she watched him write the tag number, 523 FTD, on a piece of paper. She testified regarding this tag number at trial; the contractor was not called as a witness. Remembering certain tips from a basic psychology

course on eyewitness testimony she had recently taken, Polson wrote down, on the same piece of paper that contained the tag number, what she remembered of the perpetrator's face, height, and build.

Sergeant John Williams of the Memphis Police Department, at the time a patrol officer, was the first to arrive on the scene, at 10:24 a.m. He testified that he did not recall when precisely he received the robbery call, but that he would have responded to the call immediately and that the scene of the robbery, situated near the center of his assigned ward, would have taken no more than three or four minutes to reach. Sergeant Williams spoke to Polson, whom he described as "very upset and scared." He did not speak to the contractor but saw another officer speaking to him. Polson gave Sgt. Williams the tag number, told him she observed the perpetrator leaving in a van, and described the perpetrator as a dark-complected, heavy-set, black male about six feet tall. Sergeant Williams noted these facts in his report. He gave the report to the robbery's assigned case officer, Detective Mondie Quinn.

Detective Quinn, at the time assigned to the Memphis Police Department Robbery Bureau, conducted further investigations based in part on Sgt. Williams' report. Detective Quinn testified that he ran the tag number contained in the report; it returned a white 1998 Plymouth Voyager registered to the Defendant. He also called Polson to verify certain facts contained in the report. She described the perpetrator as a heavy-set African-American male about six feet in height, noting his "chubby cheeks" and "light to medium" complexion and estimating his weight at 200 to 250 pounds.

Using this information, Det. Quinn assembled a photographic lineup of six suspects with features matching Polson's description. He returned to the Yorkshire Cleaners strip mall two days after the crime, on July 31, 2006, with Officer Paul Neely. Having learned of additional witnesses there, Det. Quinn and Officer Neely first visited Baptist Minor Medical Center (BMMC), the other establishment immediately adjacent to Yorkshire Cleaners. They met BMMC employees Rhonda Dugger and Stephanie Smith.

They spoke to Dugger, who testified at trial that she was working at the BMMC reception desk on the morning of July 29, 2006. She remembered that a man came in and asked to use BMMC's lobby bathroom. She nodded yes, viewing the man for a couple of seconds. He entered the bathroom and left a few minutes later. Dugger believed that he was inside BMMC for less than five minutes total. After about two additional minutes, Dugger noticed police cars outside and learned that there had been a robbery next door.

Detective Quinn and Officer Neely also spoke to Smith, the other receptionist working the morning of the robbery. She offered testimony similar to Dugger's: that a man, whose face she viewed for about two seconds, asked to used the bathroom; that she nodded; that he left after a few minutes; and that police arrived two to three minutes later.

Before showing them the photo lineup he had prepared, Det. Quinn directed both Dugger and Smith to read and sign an "Advice to Witness Viewing Photographic Display" form ("advice form"),

which among other things directed them "to make no identification unless [they were] positive of such identification." They both did so. Detective Quinn separated Dugger and Smith before giving a copy of the six-man photo lineup to each of them.

Dugger circled the Defendant's picture and noted his photo's lineup position on a designated space on the advice form. She signed and dated the lineup at 2:43 p.m. on July 31, 2006. She also wrote under the Defendant's circled picture, "This is the guy that came in to use bathroom on the day of robbery." Dugger testified that neither Det. Quinn nor anyone else suggested which photo, if any, she should choose. At trial, Dugger said that the Defendant wore a baseball cap on the day of the robbery but that he otherwise looked the same then as in the lineup photo, in which he had a very short goatee.

Smith also circled the Defendant's picture and noted his photo's lineup position on a designated space on the advice form. She signed and dated the lineup at 2:45 p.m. on July 31, 2006. She wrote under the Defendant's circled picture, "This is the guy that came in our facility to use the restroom. 7/29/06." Smith also testified that neither Det. Quinn nor anyone else suggested which photo, if any, she should choose. She could not remember whether the Defendant wore a hat or had facial hair on the day of the crime. She was positive about the identification at the time she made it, but she could not make the identification again at trial.

Detective Quinn then spoke to Polson at Yorkshire Cleaners. He directed her to read and sign the advice form. After she had done so, Det. Quinn gave her the photo lineup and walked away. Polson testified that she looked at the lineup for five to ten minutes "because [she] did not want to just pick someone [she] recognized off the street." She eventually circled the Defendant's photo and noted the photo's lineup position in a designated space on the advice form. She signed and dated the lineup at 2:55 p.m. on July 31, 2006. She also wrote under the Defendant's circled picture, "This is the guy that robbed me. He said give me your money or I'll blow your ass off." Polson confirmed that neither Det. Quinn nor anyone else suggested which photo, if any, she should choose. Polson testified that she believed the Defendant was clean-shaven when he robbed her, rather than bearded as in his lineup photo. She said nothing about the Defendant wearing a hat.

Based on these three identifications and the presence of the Defendant's vehicle near the crime scene, Det. Quinn directed the Memphis Police Department's Criminal Apprehension Team to obtain a warrant and take the Defendant into custody. They did so. Detective Quinn spoke to the Defendant on August 21, 2006, informing him that he was suspected of involvement in a robbery. The Defendant denied any involvement and told Det. Quinn he had been at home with his girlfriend and children at the time of the robbery. Detective Quinn informed the Defendant that his van had been spotted at the scene of the robbery. The Defendant then changed his story, telling Det. Quinn that he had been at home with his girlfriend's uncle and that his girlfriend and children had been using the van that morning. Detective Quinn spoke with the Defendant's girlfriend on the phone that evening, and then spoke to the Defendant again the following day. The Defendant again told Det. Quinn that he was at home with his girlfriend's uncle. Detective Quinn was never given the contractor's contact information, and therefore, never spoke to him about his observation of the

Defendant's van. Although Yorkshire Cleaners' security equipment did record video of the robbery, the establishment's owners refused to cooperate with Det. Quinn's request for the tape.

The Defendant called his girlfriend, Tenniale Shaw, as a witness. She testified that she had four children, three of them fathered by the Defendant. She no longer lived with the Defendant at the time of trial, but she did live with the Defendant, her four children, and her uncle on the day of the robbery. She remembered the Defendant returning home at about 5:15 a.m. that day; he got into bed and went to sleep. Shaw had been awake since about 4:00 a.m., and she did not return to bed. At about 7:30 a.m., she loaded her kids into the family's only vehicle, a white 1998 Plymouth Voyager minivan, and drove to a church event in a nearby park. Shaw and her children routinely attended this event on Saturdays. They stayed at the park until 11:00 a.m. and then went to Shaw's grandmother's house, where, but for a trip to Wal-Mart, they stayed for the rest of the day. Shaw admitted on cross-examination that she had called the police on the Defendant twice in the two months preceding trial but said that she was not afraid of the Defendant when she called the police, that she had never been afraid of him, and that fear had not motivated her to testify on his behalf.

The Defendant also testified. He stated that at 2:00 a.m. on July 29, 2006, he had gone to a nearby casino. After losing one hundred dollars, he left. He returned home at about 5:00 a.m. and went to sleep. He remained home all day, waking up later to find that Shaw had left with the children. He assumed they had gone to the park, as they usually did on Saturdays. In addition to this testimony, the Defendant engaged in certain exchanges with the State that may have been seen as damaging his credibility. In the first exchange, the State attempted to clarify the substance of the Defendant's conversations with Det. Quinn:

> [The State]: Now did [Det. Quinn] just tell you – what did he tell you about the robbery before he asked you about it? What did you know about the robbery?
> [The Defendant]: I didn't know nothing about it. When they first picked me up, they picked me up, took me down to the office up there. I sat up there like seven hours. And he told me said, well – they had went through all that when they first came said well, we got you on the tape. We got this here. We got you with a robbery. So when I got up and I sit down and start talking to him, he said well we got you on a robbery. I said I don't know nothing about no robbery. And I told him I don't know nothing about no robbery. The only thing I ever had was a habitual motor offender, driving habitual motor offender and old dope charge. That's exactly what I – I don't have – I don't know nothing about no robberies because I never did nothing like –
> [The State]: Really? That's the only thing you've ever had?
> [The Defendant]: Yes, ma'am. And a few misdemeanors.

The Defendant's criminal history is significantly more extensive than he describes above. The State subsequently impeached the Defendant regarding this history, and the Defendant admitted to nine previous felony convictions, including one for larceny.

The second exchange occurred immediately thereafter, when the state resumed its attempt to clarify the Defendant's conversations with Det. Quinn. Specifically, the State attempted to determine what explanation the Defendant could offer for changing his story after Det. Quinn informed the Defendant that his van had been spotted near the crime scene:

[The State]: Now before we took that small detour, we were talking about what you were saying to the police officer. And if we could reflect back to that point and get to the point that we were before you told the police officer what you said you told him, what is it that you were told about this robbery when you were brought in?
[The Defendant]: He just told me they had me in a robbery.
[The State]: And what else did he say?
[The Defendant]: That that's – that's what he said. I told him I don't know nothing about no robbery.
[The State]: Okay. So then what did he say?
[The Defendant]: He didn't say nothing else.
[The State]: Then how could you possibly say I was at home with my wife[1] and kids, if you don't know anything in the world about it besides the fact that there was a robbery?
[The Defendant]: He went into details about the robbery and I told – after he got through, I still told him I didn't know nothing about the robbery.
[The State]: Okay. And then what did he tell you?
[The Defendant]: He asked me so much.
[The State]: What is it that he said that made you tell him I was at home with my wife and kids?
[The Defendant]: When he said something about a robbery.
[The State]: So it didn't matter when the robbery was committed, what day, what hour, your standard excuse would have been I was at home with my wife and kids?
[The Defendant]: Right.
[The State]: Right?
[The Defendant]: Right.
[The State]: Your honor, I think with that I don't have anything else.

Defense counsel thereafter attempted to rehabilitate the Defendant by clarifying that Det. Quinn did, in fact, tell the Defendant when and where the robbery occurred before the Defendant offered his original alibi.

The jury found the Defendant guilty of one count of robbery, a Class C felony. He was sentenced as a Range III, persistent offender to twelve years in the Department of Correction. He now appeals.

---

[1]The Defendant referred to Shaw as his wife, but they were not married.

**Analysis**

**I. Admission of the Defendant's Tag Number**

The Defendant first brings our attention to the admission of Polson's testimony that she observed the contractor write "523 FTD" on the piece of paper she provided to him after the robbery. The Defendant argues that this testimony was admitted in violation of hearsay rules contained in the Tennessee Rules of Evidence and in violation of his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

Immediately before the trial began, defense counsel advised the court that he had learned that the State intended to introduce a hearsay statement of a person who was not going to testify at trial. Defense counsel was referring to the statement written by the contractor which identified the vehicle license plate number of the white van seen leaving the strip mall after the robbery occurred. The trial judge overruled the objection and stated that he would allow the victim to testify that she saw the person write down the license plate number of the vehicle.

During her testimony, the victim stated that immediately after the robbery she went out the door of the business. She saw a "contractor." She told the contractor that she "had just been robbed, and [she] needed the tag number of the vehicle that the man had just got in." She testified that she did not see the robber get into a vehicle but that a white mini-van was the only vehicle leaving the parking lot at that time. She was unable to see who was in the van. She stated that she could not see the tag number, but that the contractor was able to get the number, and that he came back into the store and wrote the number on a piece of paper in her presence. The victim then wrote additional information describing the robber on the piece of paper upon which the license plate number was written. The victim gave the piece of paper with the license plate number and other information written on it to a police officer. Later at trial, the police officer testified that the license plate number given by the victim, "523 FTD," was registered to a van owned by the Defendant.

**A. Hearsay**

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by a declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is inadmissible except as provided by the Tennessee Rules of Evidence or otherwise by law. See Tenn. R. Evid. 802.

Again, the contractor who wrote "523 FTD" on Polson's piece of paper did not testify at trial. In the contractor's absence, the Defendant contends that the trial court erred in admitting Polson's testimony that the contractor wrote "523 FTD" as the license plate number the contractor had seen on the white mini-van. The Defendant characterizes this testimony as inadmissible hearsay, and he asks that we grant him a new trial.

The Defendant argues, and the State does not appear to contest, that the written tag number is an assertion, and therefore, a "statement" under Tennessee Rule of Evidence 801. The Defendant and the State also seem to agree on what the statement asserts: that the contractor observed the tag number "523 FTD" on the white van he looked at in the parking lot. The parties disagree about the

purpose for which the statement was offered, however.  The Defendant argues that the State introduced the statement for the purpose of proving the tag number's presence on the white van in the parking lot outside Yorkshire Cleaners immediately after the robbery.  The State argues that it offered the statement not to prove the tag number's presence on the white van, but to prove that Polson saw the contractor write down that particular number.

We agree with the Defendant that the trial court, in violation of the hearsay rules, admitted the contractor's statement to prove what that statement asserted.  See Tenn. R. Evid. 801, 802.  The contractor's statement of the tag number made relevant and probative Det. Quinn's later testimony that the Defendant owned a white van bearing the same tag number, thereby placing the Defendant's vehicle at the scene of the crime.  We have also considered the hearsay exceptions contained in the Tennessee Rules of Evidence; we conclude that none apply.

Tennessee Rule of Criminal Procedure 52(a) states that "[n]o judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits."  We need not determine whether the trial court's violation of the hearsay rule was harmless, however, because we conclude below that the Defendant's constitutional right to confront the witnesses against him were violated, entitling him to a new trial.

### B. Confrontation Clause

We next address the Defendant's contention that Polson's testimony that the contractor wrote "523 FTD" violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.  That clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."  Id. at 68.  The Defendant had no opportunity to cross-examine the contractor, and the State did not demonstrate his unavailability.  As such, we must decide whether the contractor's statement was testimonial.

The Crawford Court "[left] for another day any effort to spell out a comprehensive definition of 'testimonial.'"  Id.  It did, however, note that "various formulation of this core class of 'testimonial' statements exist."  Id. at 51.  One such formulation encompasses "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  Id. at 52; see also State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008).

The Supreme Court revisited the issue of "testimonial" evidence in Davis v. Washington, 547 U.S. 813 (2006).  In determining that statements made during the course of a 911 call were nontestimonial, the Davis Court explained that

> [s]tatements are nontestimonial when made in the course of police interrogation
> under circumstances objectively indicating that the primary purpose of the

-8-

interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. at 822.

Our supreme court has also considered the definition of "testimonial" evidence, adopting a set of non-exclusive factors to aid in the determination of whether a particular statement is testimonial:

> (1) whether the declarant was a victim or an observer; (2) whether contact was initiated by the declarant or by law-enforcement officials; (3) the degree of formality attending the circumstances in which the statement was made; (4) whether the statement was given in response to questioning, whether the questioning was structured, and the scope of such questioning; (5) whether the statement was recorded (either in writing or by electronic means); (6) the declarant's purpose in making the statements; (7) the officer's purpose in speaking with the declarant; and (8) whether an objective declarant under the circumstances would believe that the statements would be used at trial.

State v. Lewis, 235 S.W.3d 136, 143 (Tenn. 2007) (quoting State v. Maclin, 183 S.W.3d 335, 345 (Tenn. 2006)).

We conclude that the contractor's statement in this case was testimonial. Following both Crawford and Lewis factor (8), we initially note our agreement with the Defendant that the contractor made his statement under circumstances that would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. Crawford, 541 U.S. at 51; Lewis, 235 S.W.3d at 143. Polson told the contractor that she had just been robbed. In asking the contractor to get the white van's tag number, Polson indicated to him that she believed the perpetrator was driving the van. The contractor returned to Yorkshire Cleaners with Polson and wrote the tag number down in order to assist any subsequent investigation. Under these circumstances, we conclude an objective witness would know the tag number would be used, at any later trial, to place the Defendant at the crime scene.

The United States Supreme Court in Davis and our supreme court in Lewis developed the definition of "testimonial" evidence primarily under the assumption that potentially testimonial statements would be made in the course of a police investigation. Here, the contractor made his statement to Polson rather than to a police officer. In our view, our decision accords with the reasoning underlying the Davis and Lewis decisions. With respect to Davis, we acknowledge that the contractor made his statement very soon after the robbery occurred. He did not make the statement in order to assist with an ongoing emergency, however. See Davis, 547 U.S. at 822. The

emergency had passed; the contractor made his statement in order "to establish or prove past events potentially relevant to later criminal prosecution." Id.

With respect to the Lewis factors, it speaks to the testimonial nature of the contractor's statement that he was an observer, that Polson initiated contact with him in order to gain potentially identifying information about the perpetrator, that the contractor made his statement in response to Polson's questioning, that he recorded the statement, and that both Polson and the contractor intended to record information tending to link the perpetrator to the scene of the crime. Lewis, 235 S.W.3d at 143.

We therefore conclude that admission of the contractor's statement violated the Defendant's rights under the Confrontation Clause. We must now determine whether a remedy is available. Again, the Defendant did not raise a Confrontation Clause issue at trial or in his motion for a new trial; he has therefore waived the issue unless he can demonstrate plain error. See Tenn. R. App. P. 3(e), 36(a); Tenn. R. Crim P. 52(b).

Tennessee Rule of Criminal Procedure 52(b) states that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." For plain error review, a defendant must establish five factors: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (adopting the factors outlined in State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "All five factors must be established by the record before" an appellate court may "recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283.

The record in this case establishes the events at trial that breached the clear and unequivocal Confrontation Clause rights outlined in Crawford and its progeny. A "substantial right" is a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense, and . . . constitutional in nature." Id. at 639. The right to confront one's accusers is such a substantial right, and the Defendant's right of confrontation was adversely affected in this case. The Defendant's attempt to exclude the contractor's statement on hearsay grounds persuades us that he did not waive the confrontation issue for tactical reasons.

We must next consider whether consideration of the Confrontation Clause error is "necessary to do substantial justice." In doing so, we note that "[a]lthough very similar to harmless error analysis, plain error review places on the defendant the burden of persuasion, whereas the State bears the burden of persuasion when an appellate court conducts a harmless error analysis." State v. Gomez, 163 S.W.3d 632, 646 (Tenn. 2005), rev'd on other grounds, (citing United States v. Olano, 507 U.S. 725, 732 (1993)). Violation of the confrontation right is non-structural error. See Coy v.

Iowa, 487 U.S. 1012, 1021 (1988); State v. Howell, 868 S.W.2d 238, 253 (Tenn. 1993). When such a constitutional right is violated and not waived, harmless error analysis requires the State to show beyond a reasonable doubt that any error was harmless, meaning it did not affect the outcome of the trial. State v. Ely, 48 S.W.3d 710, 725 (Tenn. 2001).

We must therefore consider the weight of the evidence against the Defendant had the contractor's statement been excluded. Its exclusion would not have affected the admissibility of any evidence discovered as a result of Det. Quinn's investigation based upon the tag number. As such, Det. Quinn could have testified that he learned certain information that led him to develop the Defendant as a suspect and that the Defendant owned a white van similar in appearance to the vehicle Polson saw exiting the parking lot immediately after the robbery. Polson's testimony would have been intact apart from her account of the contractor's statement. Smith's testimony and Dugger's testimony would have been unaffected.

We conclude that the Defendant has met his burden, however. The presence at the crime scene of a vehicle bearing a tag number registered to the Defendant is extremely probative and prejudicial evidence. Because the State did not produce the witness who actually observed the license plate number, the evidence should have been excluded. In its absence, the case against the Defendant rests primarily on the identifications of three witnesses, two of whom, Polson and Dugger, disagreed with one another about whether the Defendant had facial hair and wore a hat on the day of the crime.

The witnesses' accounts also presented certain time line problems. Sergeant Williams testified that he would have arrived at the crime scene at most three or four minutes after receiving the robbery call. Dugger and Smith testified that they noticed police outside only two or three minutes after they saw the Defendant leave BMMC's bathroom. Polson, however, testified that the Defendant waited behind a Yorkshire Cleaners customer for at least three or four minutes before robbing her. The robbery itself then took a few additional minutes, after which the police were called. These time frames were consistent only if the Defendant elected to use the BMMC bathroom after robbing Polson; in that case the Defendant could not have been an occupant of the white van Polson observed.

The Defendant's jury might have found him guilty under these circumstances; we cannot conclude beyond a reasonable doubt that the jury would have, however. In our view, the violation of the Defendant's confrontation clause rights was not harmless beyond a reasonable doubt. Accordingly, we conclude that consideration of this error is necessary to do substantial justice. The Defendant has therefore established plain error. We vacate his conviction and remand for a new trial.

## II. Sufficiency of the Evidence

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant

-11-

who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

We note that we must consider sufficiency of the evidence in this case as if we had not deemed the contractor's statement inadmissible as hearsay and as a Confrontation Clause violation. "Judicial review of the sufficiency of the evidence to convict that would exclude evidence deemed inadmissible on appeal would unfairly prejudice the prosecution . . . it would be inappropriate for [an appellate court] to assess the sufficiency of the evidence based only on properly admitted evidence." State v. Billy Harold Arnold, No. E2000-03157-CCA-R3CD, 2002 WL 264615, at *2 (Tenn. Crim. App., Knoxville, Feb. 22, 2002) (citing State v. Longstreet, 619 S.W. 2d 97, 100-01 (Tenn. 1981)).

The Defendant was convicted of one count of robbery. Tennessee Code Annotated section 39-13-401(a) defines robbery as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Polson testified that money was taken from her person and that she was afraid. The perpetrator threatened her with violence. The Defendant's identity as the perpetrator was, of course, the central issue in this case. Polson identified the Defendant as the perpetrator, however, and Smith and Dugger both placed him near the scene of the crime at about the time it was committed. Polson also observed the contractor retrieve a tag number registered to the Defendant from a van leaving the crime scene. This evidence is sufficient for any rational jury to find the Defendant guilty beyond a reasonable doubt.

## III. Sentencing

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges

the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. See Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. at 344. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. at 345. Thus, the 2005 revision to Tennessee Code Annotated section

40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Id. at 345.

The presentence report reflects that the Defendant was forty-one years old and unmarried at the time of sentencing. He had one daughter and two sons. He reached the tenth grade at Memphis East High School before dropping out. His history included sporadic recent employment with three construction and home services companies. The Defendant's extensive history of criminal convictions was also set forth in the presentence report. Beginning in 1986, it detailed numerous convictions for both misdemeanors and felonies, including nine convictions for driving on a suspended or revoked driver's license; five habitual traffic offender convictions; two convictions each for disorderly conduct, reckless driving, possession of less than .5 grams of cocaine, manufacture, sale, or possession of drugs, and possession of drugs; and one conviction each for simple assault, possession of marijuana, disturbing the peace, evading arrest, and petit larceny.

### A. Length of Sentence

The Defendant was convicted of one count of robbery, a Class C felony. Tenn. Code Ann. § 39-13-401(b). As a Range III, persistent offender, he faced a sentencing range of ten to fifteen years. Tenn. Code Ann. § 40-35-112(c)(3). The trial court found two enhancement factors supporting its decision to give the Defendant a twelve-year sentence: that the Defendant had a previous history of criminal convictions in addition to those necessary to establish his status as a Range III, persistent offender and that the Defendant, before trial or sentencing, had failed to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(1), (8).

As to the length of his sentence, the Defendant argues that the trial court violated his constitutional right to a jury trial, as outlined in Blakely v. Washington, 542 U.S. 296 (2004), by enhancing his sentence based on its finding under Tennessee Code Annotated section 40-35-114(8) that he had failed to comply with the conditions of a sentence involving release into the community. The Defendant acknowledges that our amended Sentencing Act has been held not to violate Blakely, see Cunningham v. California, 549 U.S. 270, 294 n.18 (2007), but raises the issue in order to preserve it for further appellate review.

We accordingly conclude that the trial court did not violate the Defendant's right to a jury trial by considering the Tennessee Code Annotated section 40-35-114(8) enhancement factor. Our

review further persuades us that the trial court considered the sentencing principles and all relevant facts and circumstances. This issue is without merit.

### B. Denial of Community Corrections

The Defendant next argues that the trial court, rather than sentencing him to serve his sentence in the Department of Correction, should have sentenced him to community corrections. Effective June 7, 2005, our legislature amended Tennessee Code Annotated section 40-35-102(6) by deleting the statutory presumption that a defendant who is convicted of a Class C, D, or E felony, as a mitigated or standard offender, is a favorable candidate for alternative sentencing. Our sentencing law now provides that a defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D or E felony, *should* be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. A court shall consider, but is not bound by, this advisory sentencing guideline." Tenn. Code Ann. § 40-35-102(5), (6) (emphasis added). No longer is any defendant entitled to a presumption that he or she is a favorable candidate for alternative sentencing. Carter, 254 S.W.3d at 347. The Defendant in this case was convicted of a Class C felony, but he is not an especially mitigated or standard offender.

The following considerations provide guidance regarding what constitutes "evidence to the contrary":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1); see also Carter, 254 S.W.3d at 347. Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. Tenn. Code Ann. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. Tenn. Code Ann. § 40-35-103(5).

Tennessee Code Annotated section 40-36-106(a)(1) outlines six additional criteria, all of which a Defendant must meet in order to be eligible for community corrections. The trial court found that the Defendant committed a crime against Polson's person and that his crime was violent, thus preventing his eligibility for community corrections under Tennessee Code Annotated sections 40-36-106(a)(1)(B) and 40-36-106(a)(1)(C). We conclude the trial court did not err in making these

findings. The trial court also found that a community corrections sentence would depreciate the seriousness of the Defendant's offense.

The Defendant further notes the community corrections "special needs exception," which states that

> [f]elony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community rather than in a correctional institution, may be considered eligible for punishment in the community under the provisions of this chapter.

Tenn. Code Ann. § 40-36-106(c). While the Defendant is correct in stating that some sentencing evidence, particularly his criminal record, tended to suggest a history of drug abuse, the section above simply allows, rather than requires, a sentencing court to grant community corrections for "special needs." In its discretion, the trial court in this case chose not to do so. Our review again persuades us that the trial court considered the sentencing principles and all relevant facts and circumstances in making this determination. We therefore conclude it did not err in denying the Defendant a community corrections sentence.

## IV. Cumulative Error

Finally, the Defendant contends that the cumulative effect of the trial court's errors deprived him of his constitutional rights to due process and to a jury trial, citing State v. Zimmerman, 823 S.W.2d 220 (1991). The Defendant does not, however, offer any argument in support of this contention. This issue is accordingly waived. See Tenn. R. Crim. App. 10(b); see also Tenn. R. App. P. 27(a)(7). We note, however, that our grant of a new trial to the Defendant on his Confrontation Clause issue obviates consideration of whether the trial court committed cumulative error.

## Conclusion

Based upon the foregoing reasoning and authorities, we reverse the judgement of conviction for robbery and remand this case for a new trial.

_____
DAVID H. WELLES, JUDGE

-16-